19-3148, counsel for appellant, please make your appearance. May it please the court, Mr. Ellis appears through counsel Bruce Joseph. Mr. Ellis' appeal is focused on the district court's analysis of the funda. Judge Freidel applied the wrong law in sentencing. This is well illustrated by looking at the 2015 amendment to 1B1.3, the relevant conduct guideline. Amendment 790 struck the language of relevant conduct focused only on two elements. That's foreseeability and jointly undertaken activity. And it clarified that there are three elements. The first of which is the scope element. The conduct must be within the scope of the jointly undertaken activity. Now, Judge Rattle focused only on foreseeability and jointly undertaken activity, the old language. The amendment also added an application note 3B, which explained this new scope requirement. It really wasn't new, I should say. It explained moving the scope from the comments up into the text. And this language is really important, and it's exactly on point. The court must determine the scope of the criminal activity the particular defendant agreed to undertake, jointly undertake. In other words, the scope of the specific conduct and objectives embraced by the defendant's agreement. Now, that is exactly what I was talking about throughout sentencing. Judge Rattle would ask, well, aren't you talking about separate conspiracies? He was convicted of count one when, in fact, I was talking about the scope, whether or not he was embracing the conduct and the objectives of all of Marvin Tatum's sales. This law is not new to the circuit. Amendment 790 was a clarifying amendment. In fact, as far back as 1997, Judge Seymour held in the United States v. Milton, writing for the panel, that attribution requires particularized findings about the scope of the individual defendant's agreement in relationship to the conspiracy as a whole. 17 days before sentencing in Ellis, this court in the United States v. Patton, again, Judge Seymour on the panel, said the same. The court must determine the scope of the particular defendant's agreement. Again, what the defendant embraced, what did he agree to be part of, and what did he have an interest in? This is a large conspiracy involving multiple defendants. He clearly is not sentenced based on a 50 or so defendant quantity. And one can accept the notion that that would, I think, be error if he were sentenced based upon the larger conspiracy. But I want to, although I would delight in engaging on your lawyer office hypothetical, and I hope to do that soon, I'm going to be more concrete to begin with. If you would go to illustration number seven, or it's Roman numeral five and two Romanets after that, seven. I like that hypothetical for this purpose because this is the one where you had drug carriers moving dope across the border. They get the dope from the same supplier. And in that instance, the guidelines distinguish between a situation in which they had moved the dope across the border separately, or they moved the dope across the border together. Now, no, other than moving the dope across the border together and therefore finding reinforcement in being in a group, protection, those things, I think the guidelines use the word for mutual assistance or protection, there was no connection between them. And yet the court said, I mean, the guidelines say you should attribute the dope of every one of those participants to the other. That, it seems to me, at its core, if nothing else, is what we have here. Because we have the defendant going on drug trips with Mr. Tatum. We have the defendant having a home with Mr. Tatum where they're moving drugs. We have the defendant having, they're using the same phone to move drugs. So even if you assume that they were independent contractors, they had their own clients, they're doing their own dope thing, illustration number seven suggests that they, just by virtue of being involved in, to use the guidelines words, this mutual assistance and protection, should have the dope of Mr. Tatum attributed to Mr. Ellis. So help me with that illustration. So if there is something like moving dope together, pooling resources, I think you have a point. That's not what the guidelines said. It said they got the, they got the, they were, they're essentially, you know, it's sort of a pejorative term, but sometimes use drug mules. They're moving drugs across the border. They get them from the same supplier. There's nothing in that illustration that suggests they're friends, they're close, they know each other. Just that they are going across the border at the same time for mutual assistance and protection. Now, the fact that these defendants, Mr. Ellis and Mr. Tatum, use the same phone, stay at the same house, go to Deshaun or whatever his name is and get the drugs. I mean, together, they did a heck of a lot more than these guys who are just moving across the border. Why isn't that just determinative of what your, your argument here? Well, let's take that one piece at a time. First of all, the other guideline example that you have that you have to compare is that a common source of supply is not dispositive. It doesn't help. And so the question is, is this, is this Skykes fella a common source of supply or is there more to it? Is it more like protecting each other as they move dope across the border? And that's what I'm asking you. Why isn't it exactly that since they would go to get the stuff together? They would use the same phone. They lived at the same address. Why isn't it exactly that? Let's go through those one at a time. Sure. First, go together, right? They do drive together or show up at the same time together. Now, is that tantamount to mutual protection, moving drugs across the border? No, because when they show up together, they engage in separate transactions at the same time. That satisfies foreseeability, but that does not mean he's embracing the objectives or the acts that thereafter happen when he sells it. They just happen to show up. What you need more is something like the protection by, you know, the mutual transport. You need something like a negotiated benefit, like buying together equals a reduced price. There needs to be something more than contemporaneous distinct transactions. They are distinct, and there is no evidence to say more than that, such as the mulling together for protection. I'm sorry. I didn't mean to cut you off. Go ahead. No, you're fine. There is no sense. You mean to tell me that the fact that they are traveling together to get the drugs doesn't make it less likely they will be jumped, just as in the mules going across the border? It doesn't make it less likely that there will be some problem? They went together to do this deal, even if we accept the notion that they were having entirely distinct transactions. They're there together. I think that would be a distortion of the intent behind those examples. I mean, if you're moving drugs across the border, that's a dangerous—I mean, we can all take common sense and experience. No, that's a dangerous activity to engage in that's going to be a challenge, and that would be a benefit. Driving a couple blocks down the street in Kansas City, Kansas, and just happening to show up at the same time because their friends and cousins is not the same as mulling dope across a border, past border protection agencies, that's totally different conduct. I'm not going to cast any dispersions on Kansas City, Kansas, but I would wager there are certain portions of there where I would look for protection. May I ask a question on this, Council? May I ask a question? There's more than just going together and separately purchasing crack. They go together when just one of them is selling crack. They live in the same house over the conspiracy period of time. Isn't that protecting each other? Don't they do that for safety reasons? I mean, can't that inference be drawn? So, yeah, I was about to run through the additional factors that Judge Holmes pointed out. The residents, the Haskell evidence. Now, when you drill down on that evidence, the evidence was that Mr. Ellis rented it, and at some point, Mr. Tatum took over that lease, kind of got it out from under him. The utilities were still in his name, and there is evidence that they were together at times. I mean, they are cousins. They are family members. They are present at the house, and they do engage in some transactions. I don't think the evidence was that they both were living there, and certainly not for protection. Theopolis testified that they stayed there, that they both stayed at other places as well. That was really Tatum's place, but that Marvin was there occasionally. You know, the question becomes whether or not the relationship that they had being present, cousins, family members, is that enough to move it along to say that it's a common scope, meaning that Marvin Ellis embraced the objectives and all of the acts of Mr. Tatum's much larger drug distribution office operation by simply being around him. It's kind of like the controlled sales when they showed up. More than just Marvin was convicted of maintaining a drug house, that drug house. Doesn't that indicate he's responsible for what Tatum is cooking there, selling from there? So that's a difficult fact, but we can't really look behind what the jury came up with. He did at some point maintain it himself because he was the tenant and the sole tenant. Mr. Tatum took over thereafter. We can't really look behind to see what the jury's intent was. All we know are the facts, which is that he was there after Tatum took over on a contract for deed and essentially assumed that lease. Can't we assume that the utilities were in his name, that he was paying the utilities? No, absolutely not. In fact, no. Is there evidence to the contrary? The evidence was that Mr. Tatum took over the residence on a contract for deed after the utilities were set up. No, in fact, it seems pretty clear that Mr. Tatum assumed that residence and Mr. Ellis was there occasionally. But to Judge Seymour's point, I mean, all we know is he took over the lease, Tatum. There's nothing that says he started paying utilities. And I mean, the utilities stayed in his name. Well, I'm sorry, Judge Seymour, did you have further? I would just suggest it's a far leap to assume that these gentlemen are quite responsible and would change the names of the utilities as opposed to just simply going in and paying cash for the existing utilities. I mean, that really doesn't make a lot of sense that Mr. Tatum would go ahead and put the utilities in his name after taking over. In fact, he would want to do the opposite as a drug dealer. He would not want to have anything in his name. Well, he wouldn't want to have it in his name might mean that he had Ellis pay for. And let's look at that factor for a second. The Haskell Street house, not only do you have Ellis with his name on the utilities, you have Tatum taking over the house. I refer you now to illustration number five dash with one Romanette. And in that one, you're talking about the court talks about. I mean, the guidelines talk about pooling resources. It says, in contrast, if in a queue, another street level dealer pools his resources. No, it says profits, too. And we don't have any evidence of that, I think. But why is it the notion of somebody paying for the rent on a place while another person plays for utilities? And at least on paper, that's exactly what was happening. Why is it that pooling resources or a joint endeavor to distribute narcotics? And again, even with you could even assume they had separate clients, but they ran the house together to sell drugs. I think I think that's a far stretch of the evidence. I mean, Tatum takes it over on a contractor deed, doesn't go in and change the name on the utilities. We have no idea. I agree. It's possible that Ellis still paid those, but certainly no evidence to indicate that it becomes Tatum's private primary residence. Ellis, according to Doppler, stayed there sometimes. He doesn't know where he spent his nights otherwise. So, I mean, that's I think your characterizations are similar to what the government is saying, which is pretty broad. And it's a pretty big leap from the facts that the limited facts that they have. We just know that they were both there, that they had independent sales. And remember, the question is this, not only were there not particularized findings made, which is required, but moving on beyond that, did he embrace all of Tatum's objectives and sales? Is that part of the scope of this agreement simply because Tatum took over his, what was his lease into taking it over as a contractor for deed? That comes up short. And again, it's the government's burden. Those facts are short. Also, the phone, you know, Marvin had his own phone. The government would call, the agents would call his own phone to set up deals. The only clear example of whether or not they're working together or in competition is clear. And that's the Sarah Bigelow sales. That was a customer of Marvin Ellis. The government directs him, her to call Tatum, thereafter to call Ellis. When she calls Ellis and meets with him, she says, stop, he says, stop messing with Tatum, only buy drugs from me. They're in competition. Do I recall correctly that, that Sykes, is it Sykes, that Ellis didn't even have his number, right? So that was a, that was a speculative statement by Sykes. He said, you know, they always came together. I assume he doesn't even have my number. He has no basis for saying that. I don't know if he did or not. He would know whether, he would know whether he gave it to him. Sure, sure. Okay. Well, if he, if he didn't get it from, okay. All right. And the evidence was that all the calls went to, were between Sykes and Tatum, right? I mean, there wasn't any evidence of Ellis calling. That's fair. And again, whether or not that means Ellis could or could not have. Well, there's some evidence in the record that, that he could not have, he did not have the number. Possible he did not. It's possible he did. He just didn't exercise it. Thank you, counsel. Thank you. Good morning. Thank you. Good morning, your honors. My name is Carrie Capwell and I represent the government in this appeal. The district court here did make and adopt the requisite particularized findings regarding the scope of the jointly undertaken criminal activity. During the resentencing hearing the district court stated clearly both of them, meaning Marvin Ellis and Adam Tatum are engaged in drug deals and maintaining a drug house in furtherance of that criminal activity. She also noted that given all the government, all the government's evidence, the fact that they live together, they conducted drug transactions out of that house. The fact that Ellis paid for the utilities for that house and made a down payment on the lease that she felt the government had met its burden to prove relevant conduct. And I think it's important to remember that the district court was not working from a blank slate here. In fact, this case has already been up on appeal and this court has already made findings in its opinion in that case. And in that opinion, this court made very clear that while there was this overarching, very large conspiracy with the Mexican drug cartel at the top, that Ellis and Tatum and the nephew, Theopolis Ellis, were working together. They were part of that conspiracy, but they were their own unit. And this court actually said that Ellis had begun working with Tatum and Ellis' nephew to buy powder cocaine from Sykes and cook at least some of it into crack cocaine for sale to their customers. Over the next few months, the three men worked together to sell drugs, including crack cocaine. They sold the drugs from different locations, including the house at Haskell Avenue. And then the court discusses the lease and the contract to buy it. So this court itself has already made the findings that Ellis, Tatum, Theopolis Ellis were working together to buy drugs from Sykes, cook them, make crack cocaine, and then sell them to their various customers. So the district court, in making her findings and in addressing this sentencing, already had this court's decision, Ellis won, from which to draw. So I think it's important to remember that. And also, the district court did note in its statement of reasons that it had adopted all the facts in the PSR with one limited change, actually dropping down the drug quantity for which the court found Ellis responsible. And part of the PSR findings included paragraph 107 in the PSR, which noted that Ellis and Tatum were involved in a jointly undertaken criminal activity that included purchasing cocaine from Sykes and selling crack cocaine at various locations together in the community and from 921 Haskell Street, which sounds very much like what this court said in Ellis won. The PSR at paragraph 107 also noted that further evidence of the jointly undertaken criminal activity was that Tatum's phone was being used to arrange sales, a sale that was later consummated by Mr. Ellis, and that Mr. Ellis sometimes accompanied Mr. Tatum on drug deals. So that that evidence was in the PSR and the district court adopted the findings in the PSR. So those findings can be attributed to the district court and found to be part of the particularized findings that the district court made on the scope of the jointly undertaken activity. Moreover, I don't know if your honors would like me to stay on point one, I can move to point two, which is the government's burden of proof here. And I will do that unless your honors come back to to issue one, which is more what I understand to be defendants claim that the court made a legal error or procedural error in sentencing. And on that issue, if I recall correctly, you had made a plain error argument. Is that right? That is right, your honor. And I will say I, I think this one is a close call. I will say that I think it was worth making the argument to preserve it. And I think the issue that I saw was that, well, certainly, Mr. Joseph did make clear during sentencing that when the court talked about Mr. Ellis and Mr. Tatum being convicted in a conspiracy, you know, Mr. Joseph did push back and say, well, that's not enough. I mean, you've got to drill down more. Certainly he did that. But when the court Well, no, he said more than that. He said, you have to, you have to make particular findings, Judge, about the scope of my guy's agreement. Correct. I'm paraphrasing. It was pretty specific. Yes, and he talked about And then later he reiterated that he made his objection. And now that is his objection is that she didn't make specific findings here. Um, I mean, to me, it sounded more like they were at the the argument at sentencing was that they were that we offered insufficient evidence that there was insufficient evidence of a jointly undertaken Agreement for criminal activity. And so that's where my plan error argument comes in after the district court then said Because after the district court makes the statement that the defendant takes issue which which is when the district court said it seems to me that the fact that both defendants are members of the same criminal conspiracy to distribute drugs clearly meets subsection one of relevant conduct. So one which same criminal conspiracy was a district court referring to the overarching one or the one that this court made clear was the applicable one the smaller conspiracy of Ellis Tatum, which was a subset of the larger conspiracy. But right after the court made that statement, which the defendant takes issue with the district court said clearly both of them are engaged in drug deals and maintaining the drug house and further into that drug criminal activity. And then the court talks about the evidence that the government outlined. So I would argue that after the court made those statements. The defendant at no point said your analysis is still insufficient. You still judge have not made the particular eyes findings that it's the 10th Circuit requires so that that's my issue. In the end, I really don't think it makes a difference because I think the government wins on no error. Well, it may not make a difference. But, but it seems to me that it's hard. I'm hard pressed to see what else the defendant could have done. I mean, except for this last thing of stating something as it relates to scope that he had already stated over and over again. I mean, he stated in the PSR, you got to have findings as it relates to scope. Let's see. He said he was very clear in his objections to the PSR. He was very clear in the in the context of the sentencing as to what needed to happen. And we have this case Lopez Avila where we're essentially we dispense with the need to say something else when it was very clear that you that there wasn't anything else to be said that the court just didn't do what he asked her to do. So let's focus then let's assume that we are under that we are dealing with the question of error, at least for my purposes right now and and tell me if I guess you have been making arguing why there was no error. Right. Right. So one first no error because the court did actually make particular eyes findings and the way I've described and I won't go through that again. And then moreover, even if the court's statement could be deemed when viewed in isolation to have been error. I argue that it's harmless error in this case. And again, it goes back to the district court having adopted the PSR and that there are particular findings in the PSR and then Moreover, As I argued this court already has made the requisite findings as to the scope of the agreement and this court can affirm on any ground that it finds is supportable by the record. So I think even if the district court made an error in that isolated statement, which I still submitted did not I think it was it was a harmless error and that the particular eyes findings were made here. And you are relying on this Figueroa Labrada case right for the For being able to adopt the PSR Figueroa Labrada and Godinez Perez. And by doing that, it wouldn't be wouldn't be error at all. Right. I mean, because you would you would supplement those findings and that would be it. The PSR would be the district courts fine. Yes, the government's position is yes. Should this court find that that still wasn't sufficient, then I would go to the next level, which is we have the decision and Alice one And and if you look at the entire record and all the evidence that the government put forward at sentencing and in the PSR This court on its own could affirm and find that the particular is findings are in the record, even if the district court didn't spell them out as clearly as one would have liked. All right. And then as to issue to the government's position there is that our burden is preponderance of the evidence we more than satisfied that at the resentencing hearing We relied on a lot of different factors, but it mostly came from the trial testimony. So it's a lengthy trial. There was a lot of evidence that came out. So I will briefly summarize I'm sorry, could I could let me just stop you for a second, but your, your argument suggests maybe I'm a little confused here. I thought issue to really was expressly condition on issue one. In other words, if he loses on the scope issue. Then issue two. I don't think he can test that if if Tatum is within the scope of the joint undertaking activity. Then the dope amounts should be attributed to him. I mean, is there anywhere where that was contested I guess your honor. I'm sorry. I'm not answering question because I think I probably just look at it differently. I see issue one as did the did the court make a legal error in one of its statements and to Did the court just say enough or put enough on the record to make the findings and then that issue to is okay if the court did do enough to put the particular is to make the findings were those findings even correct. So issue two, as I understand it. Now I'm addressing that. Yes, the district courts factual findings were correct because they were supported by a preponderance of the evidence that the government offered at the resentencing Factual findings were correct that that in fact there was that they were part of a jointly undertaken activity. And actually, I should restate that because relevant conduct is a legal. It's a legal issue which this court has been a little messy on that that You look at my Tennessee case we haven't been as clear as we should be. But, all right, so adopting the view that the relevant conduct is a legal determination. Are you saying, then, that the first issue was just an articulation issue as you see it. And the second issue is was were they in fact involved in the jointly undertaken activity based upon the findings. Corrected the government presents sufficient evidence so that the court could make its finding that that there was relevant conduct and there was this joint agreement. Okay. And and so really we summarize a lot of what is already in Ellis one we summarize Sykes's testimony. Some of the highlights are that Tatum introduced Mr. Ellis to Mr. Sykes. The two men went together 10 to 15 times to buy cocaine from Mr. Sykes all within this six month window. That Ellis and Theopolis and Theopolis was their kind of task. He ran tasks for them drug related tasks, whatever they needed that Ellis and Theopolis would sometimes pick up cocaine for Tatum from Mr. Sykes and this is all Mr. Sykes's testimony. And then you move on to Theopolis and Theopolis was really in the mix with them and had reason to know probably, you know, more than once you put Mr. Ellis and Mr. Tatum aside, he knew the most And he talked about how he started in January of 2012 working with both men, they would buy cocaine from Mr. Sykes, they would sell the crack. They shared the house. Both men would would go together at times to buy the crack. Sometimes Theopolis would go and pick up the cocaine for them. He said that they shared at least one phone and that customers would call that phone, which all three men use. So again, pulling the resources working together. He said that both men lived at the 921 Haskell Street address and that sometimes customers did pick up their drugs at that address. He noted that other times he Theopolis or either he or Tatum or Ellis would deliver the drug. So it just was a combination of Those three individuals delivering drugs to their customers. Theopolis was compensated by both men for his tasks. And then he's the one that offered the testimony that Mr. Ellis and Mr. Tatum had a falling out toward the end of this time period because Tatum was was too bossy and so that kind of ruined the relationship between Mr. Tatum and Mr. Ellis, which Also goes to corroborate the point that they had previously been working together and then this rift developed between the two men, the two main men, Mr. Ellis and Mr. Tatum Was there, was there any evidence and perhaps I missed it, but I didn't see any evidence of splitting of profits. Is there anything in there to suggest that to indicate that they actually shared profits and and and that that takes us back to the guidelines illustration, which spoke about Drug dealers who shared resources and profits so and and I posited, at least for argument's sake, that they could conceivably have shared resources, but I didn't see any evidence that they shared profits. I just went out. Um, Your Honor, may I answer that question. I guess that shows how boring I am. Turn the lights out. Go ahead. I'll go ahead and answer. I don't have any specific information or evidence to offer you on the splitting of profits. I think the closest thing I can offer on the kind of handling of money together. Was a situation that came up. I believe it was a March 26 no not March 27 it was late March, March 23 and this was, I think, testimony by one of the officers and It was a controlled by so Mr. Ellis got into the car with the confidential informant and conducted a drug deal for Molly's so not for crack or cocaine, but for Molly's pills. Then, um, and and Ellis collected the money from this customer and then Ellis went, as I understand it, and either got back in the car. They drove in or just got out of the customer's car and then Tatum got in the customer right afterwards Tatum got in the customer's car and then sold the customer. Like six and a half grams of crack, but Alice had already collected all the money. So I think that's maybe the closest thing I can give you to show that It seems like they did kind of share Ellis was holding all of the money for from that customer, even though part of it. Was likely Tatum's as well. And I think that might also go to the kind of the protection issue where just one gets in the car with the customer. The other one is outside, whether he's on the lookout, or at least he has the money so he, you know, He can leave at the cop show up.  Um, all right. Thank you, counsel. Any further questions. All right, cases submitted. Thank you.